# WESTERN UNION TELEGRAPH COMPANY · *v.* BROWN, . EXECUTOR OF LANGE, ET AL.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 159.  Argued January 20, 21, 1920.—Decided May 17, 1920.

One who, in repudiation of a contract which binds him to make a certain payment, sends a telegram to stop a draft previously dispatched to meet the obligation, can not recover the amount from the telegraph company because of its negligent failure to deliver the telegram in time.  P. 113.

P and C agreed to sell and deliver, and H and ·L to buy, take and receive certain shares of mining stock, "upon the following terms and conditions:" The price stated was to be paid· part down and the remainder in equal payments on stated future dates; upon the making of the first payment the shares, endorsed in blank, were to be deposited with a bank under an escrow agreement for delivery to H and L when the last payment was made; the bank was constituted the agent of P and C to receive the payments, and, in event of default by H and L, was authorized by the terms of the deposit to deliver all the shares to P and C, whereupon all payments theretofore made should be forfeited to them, and "all rights of each of the parties should forever cease and terminate."  *Held*, not an option terminable at the will of the vendees by failure to meet deferred payments, but an absolute agreement on their part to buy, the provision for forfeiture of past payments and termination of the agreement in case of their default being intended for the protection of the vendors, and exercisable at the vendors' election.  P. 110.  *Stewart* v. *Griffith*, 217 U. S. 323.

The provision in such contract that upon non-payment of stipulated sums the rights of each of the parties shall cease and determine is the equivalent of a provision that in case of such default the contract shall be "null and void."  P. 112.

248 Fed. Rep. 656, reversed..

THE case is stated in the opinion.

*Mr. Beverly L. Hodghead* and *Mr. Rush Taggart*, with whom *Mr. Francis R. Stark* was on the briefs, for petitioner.

The following were cited as holding that such contracts are absolute agreements to buy as well as to sell and not mere options, and that the forfeiture provision is for the benefit of the vendor. James, Option Contracts, § 109; *Stewart* v. *Griffith*, 217 U. S. 323; *Wilcoxson* v. *Stitt*, 65 California, 596; *Central Oil Co.* v. *Southern Refining Co.*, 154 California, 165; *Weaver* v. *Griffith*, 210 Pa. St. 13; *Vickers* v. *Electrozone Co.*, 66 N. J. L. 9; *Hamburger* v. *Thomas*, 118 S. W. Rep. 770; *Knickerbocker Life Ins. Co.* v. *Norton*, 96 U. S. 234; *Jones* v. *Hert*, 192 Alabama, 111; *McMillen* v. *Strange*, 159 Wisconsin, 271; *Meagher* v. *Hoyle*, 173 Massachusetts, 573; *Dana* v. *St. Paul Investment Co.*, 42 Minnesota, 196; *Shenner* v. *Pritchard*, 104 Wisconsin, 291.

*Mr. Samuel Poorman, Jr.*, for respondents:

No absolute sale was made. *Ramsey* v. *West*, 31 Mo. App. 676; *Beckwith-Anderson Land Co.* v. *Allison*, 26 Cal. App. 473; *Verstine* v. *Yeaney*, 210 Pa. St. 109; *Pittsburg Brick Co.* v. *Bailey*, 76 Kansas, 42; *McConathy* v. *Lanham*, 116 Kentucky, 735; *Williamson* v. *Hill*, 154 Massachusetts, 117; *Gordon* v. *Swan*, 43 California, 564. The sale and purchase were declared to be "upon . . . conditions;" and one of those was that upon default by plaintiffs in paying any instalment "all rights of each of said parties hereunder shall forever cease and determine." The intention here was that, upon default, there should be effected automatically a wiping out of all rights of either party. In precise phrase the contract defined the only rights existing in case of default and the very steps to be then taken by the depositary in escrow, and expressly declared the non-existence of any other rights whatsoever.

A forfeiture is not favored by the law; and a forfeiture

that can be invoked or not, according to the election of only one of the parties to a contract, should meet with especial disfavor.   But where the forfeiture is in a manner compensated for by having the effect of wiping out all rights and liabilities under the contract, there is less reason for viewing it askance.   The vendor will always seek to frame the contract in terms giving himself the election either to enforce a forfeiture or to compel a performance. Without a word in the contract on the subject, the law would give him this election.   *Glock* v. *Howard Co.,* 123 California, 1.   Therefore, when the parties insert a provision as to forfeiture and the termination of all rights of each of them by the mere fact of defaulting in payment, it is reasonable to suppose that they intended thereby to assent to something different from what the law itself would have read into the contract in the absence of such a provision.

The present is not a case wherein ordinary property was the subject-matter of the contract, as in *Wilcoxson* v. *Stitt,* 65 California, 596 (city realty); but is one where the investment was of the same hazardous nature as in *Gordon* v. *Swan, supra* (a mine), and in *Williamson* v. *Hill, supra* (patent rights), in the latter of which it was said that the purchaser's right under such a contract was to determine, from time to time, whether he would pay an additional instalment and thus continue the contract in force for a further period, or whether he would forfeit what he had already paid, forego any rights to the property, and escape further liability.   Distinguishing: *Cape May Real Estate Co.* v. *Henderson,* 231 Pa. St. 82; *Wilcoxson* v. *Stitt,* 65 California, 596; *Stewart* v. *Griffith,* 217 U. S. 323.

MR. JUSTICE DAY delivered the opinion of the court.

This is an action by Brown, executor of Lange, and Hastings to recover damages from the Western Union

Telegraph Company for failure to deliver a message sent by Hastings and Lange to the Lyon County Bank, Yerington, Nevada. A judgment was recovered against the Telegraph Company in the District Court, which was affirmed in the Circuit Court of Appeals for the Ninth Circuit. 248 Fed. Rep. 656. The case is here upon writ of certiorari.

Upon stipulation the case was tried in the District Court without a jury, and the court made findings from which it appears: On March 16, 1907, W. C. Pitt and W. T. Campbell entered into a contract with Hastings and Lange for the sale of 625,000 shares of the capital stock of the Kennedy Consolidated Gold Mining Company. In this contract it was stipulated that Pitt and Campbell agreed to sell and deliver to Hastings and Lange, who agreed to buy, take, and receive from them 625,000 shares of the Kennedy Consolidated Gold Mining Company, upon the following terms and conditions: First. The total price to be paid for the shares of stock to be $75,000 in gold coin of the United States payable $7,500 on the execution of the agreement; $11,250 on or before the first day of May, 1907; and the like sum on or before the 5th of July, 1907, the 5th of September, 1907, the 5th of November, 1907, the 5th of January, 1908, and the 5th of March, 1908. It was agreed that immediately upon payment of the first-named sum, Pitt and Campbell would deposit in escrow in and with the Lyon County Bank, of Yerington, Nevada, certificates of stock indorsed in blank representing in the aggregate 625,000 shares of the capital stock of the Mining Company, and would thereupon enter into an escrow agreement with Hastings and Lange and the bank, under which agreement the bank should hold the shares of stock to be delivered to Hastings and Lange upon the payment by them of the final sum provided for, and the bank was constituted the agent of Pitt and Campbell for the purpose of receiving the payments

under the agreement, and it was further agreed that in event of default by Hastings and Lange the bank should be authorized under the terms of such deposit in escrow, to deliver all the shares of stock, so deposited with it, to Pitt and Campbell, and all payments theretofore made by Hastings and Lange should be forfeited to Pitt and Campbell, and that thereupon all rights of each of the parties should forever cease and terminate. Hastings and Lange paid to Pitt and Campbell the initial sum of $7,500, and Pitt and Campbell deposited in escrow with the Lyon County Bank certificates of stock representing 625,000 shares of the stock of the Mining Company properly indorsed, and the bank received said certificates in escrow and held the same in accordance with the contract. After the execution of the contract Hastings and Lange arranged with the bank to treat drafts that they might send it in partial payment as gold coin, and to pay the amount of such drafts in gold coin to Pitt and Campbell under said contract. That, for the purpose of making the payment, mentioned in the contract, which became due on or before May 1, 1907, Hastings and Lange on April 27, 1907, sent by mail from Oakland, California, to the Lyon County Bank, at Yerington, Nevada, a draft for the sum of $11,250 United States gold coin, payable to the order of the bank; that the draft was received by the bank at Yerington, Nevada, on April 30, 1907, some time between 8:30 A. M., the time the bank opened for business, and 9 o'clock A. M., of that day; that on April 29, 1907, before the message, hereinafter mentioned, was delivered to the Telegraph Company, Hastings and Lange were informed and believed that the stock of the Mining Company was of little or no value, and, upon obtaining such information, they determined to make no further payments on their contract with Pitt and Campbell, and to abandon their rights in and to said stock, and to withdraw from the transaction with Pitt and Campbell. It is further found

that on the evening of April 29, 1907, plaintiffs called at the office of the defendant in Oakland, California, and requested the agent in charge to telegraph the Lyon County Bank at Yerington, Nevada, as follows:

"Oakland, April 29, 1907.

Lyon County Bank,

Yerington, Nevada.

Draft mailed you Saturday under mistake. Do not pay any sum to Pitt or Campbell. Return draft. Letter follows.

Hastings and Lange.'

Hastings and Lange stated to the agent of the Telegraph Company that it was necessary that the message be delivered to the bank before banking hours on the following morning, that is, before it opened for business on the 30th day of April, 1907, and desired to know of the agent in what manner they could be absolutely assured that the message would be so delivered, stating to the agent that they had a contract for the purchase of certain shares of stock of a mining company, and that payment under the contract was required to be made by them on or before May 1, 1907, to Pitt and Campbell through the bank, and that in default thereof the contract to purchase the stock would by its terms be forfeited, and the rights of the parties thereto would cease and terminate; that for the purpose of making the payment they had mailed to the bank a certain bank draft in the sum of $11,250; that in the ordinary course of the mail between the city of Oakland, California, and the town of Yerington, Nevada, the same would be delivered to the bank on the following morning, that is to say, during the forenoon of April 30, 1907; that since mailing the draft they had learned facts touching the value of the stock which had determined them to make no further payments and to forfeit the contract and all money by them paid thereunder; that they were seeking

by the message to intercept payment by the bank on account of the contract to said Pitt and Campbell, and that unless such message were transmitted, and delivered immediately to the bank before banking hours on April 30, 1907, it would receive the draft and make payment of the amount thereof to Pitt and Campbell, in which event the amount would be wholly lost to them as they did not intend to continue under their contract, having learned that the stock was of little or no value.  It was further found that thereupon the agent represented that the Telegraph Company would insure the immediate delivery of the message to the bank at Yerington if plaintiffs would pay the sum of $1.45, which sum was in excess of the Company's regular charge.   Plaintiffs accepted the proposal, and paid the sum to the agent, and, in the presence of the plaintiffs, the agent thereupon wrote upon the message, immediately below the date thereof, the words: "Deliver immediately," and accepted the message for immediate transmission to the town of Yerington for immediate delivery to the bank and agreed to immediately transmit and immediately deliver it to the bank for the plaintiffs, and assured the plaintiffs of such immediate transmission and immediate delivery thereof; that the sum of $1.45 was in excess of the defendant's regular charge and usual toll, the usual charge for an unrepeated message being 98¢, and for a repeated message the sum of $1.47.   The message was written upon a blank form of the Telegraph Company, which is set forth in the findings.

It is further found that neither Hastings nor Lange read the printed matter on the blank, nor was either of them cognizant of the terms and conditions written thereon. The message was not repeated in the manner provided in the stipulations on the blank.  That the regular course of communication by telegraph between Oakland, California, and Yerington, Nevada, was by the lines of the Western Union Telegraph Company to Wabuska, Nevada, which

was the terminus of the Telegraph Company's lines for
Yerington messages and that in order to transmit tele-
grams beyond Wabuska it was necessary that they be
transmitted from that point over the telephone line of the
Yerington Electric Company to Yerington; that each of
the companies received all messages offered it by the other
company for further transmission, subject to the stipula-
tions on telegraphic blanks, each company having and
charging its separate toll. That the offices of the Elec-
tric Company and the Telegraph Company were both
maintained in the Southern Pacific Railroad Company
station at Wabuska, and that the telephone instrument of
the Electric Company was within a few feet of the tele-
graphic instruments of the Telegraph Company; that at
the time the Southern Pacific Railroad Company em-
ployed an agent at Wabuska to attend to its railway
business, and that by an arrangement between the Rail-
road Company and the Telegraph Company said agent
was employed to attend to the telegraph business of the
Telegraph Company at Wabuska; that by agreement
between the Railroad Company and the Electric Company
the agent of the Railroad Company was at the same time
employed by the Electric Company to handle the tele-
phone business of the Electric Company; that there was a
regular stage line open between Yerington and Wabuska
in April and May, 1907; that the distance between
Yerington and Wabuska was approximately eleven miles,
and could be traversed in the stage in about one and one-
half hours.

It is found that the Telegraph Company did not
promptly, upon the receipt of the message on the even-
ing of April 29, 1907, transmit it to the town of Wabuska,
Nevada; that the defendant did not promptly deliver
the message to the Electric Company for further trans-
mission over its telephone line to Yerington, Nevada,
but on the contrary defendant wholly failed and neglected

to transmit the message to Wabuska until May 2, 1907, and wholly failed and neglected to deliver it to the Electric Company until May 2, 1907; that the delay in the transmission of the message occurred wholly on the lines of the Telegraph Company, and was caused by that company, and did not occur on the lines of the telephone of the Yerington Electric Company.

It is further found that if the Telegraph Company had proceeded with reasonable promptness to transmit and deliver the message to the bank, the same would have reached Yerington before the bank had received the draft mailed to it as aforesaid, and it would not have placed the amount represented thereby to the credit of Pitt and Campbell, or either of them, or paid any amount thereon; that by reason of the gross negligence of the Telegraph Company the message was not delivered to the bank until May 2, 1907; that on April 30, between the hours of 8:30 and 9 A. M., the bank had received the draft and thereafter on that day had paid over the amount thereof in gold coin to Pitt and Campbell pursuant to the terms of the contract between the plaintiffs and Pitt and Campbell on account of the payment to be made on or before May 1, 1907, and had given credit to Hastings and Lange for the amount of said payment, all of which was done without any knowledge of said message or the determination of Hastings and Lange to recall said draft; that Hastings and Lange did not make any further payments on the purchase price of said shares of stock, but abandoned the contract with Pitt and Campbell and forfeited and lost all moneys paid thereon.

It was found that the 625,000 shares of stock of the Kennedy Consolidated Gold Mining Company have been at all times, and since and including April 29, 1907, practically valueless.

The Circuit Court of Appeals held: (1) That the contract was an option terminable by the buyers' failure to

make the payments required; (2) The oral agreement for the transmission of the message was a binding agreement upon the Western Union Telegraph Company; (3) That under the circumstances the Telegraph Company was guilty of gross negligence in failing to transmit and deliver the message. The court thereupon affirmed the judgment of the District Court for the amount of the payment, adding interest.

In our view of the case it is unnecessary to consider the correctness of the decision of the Circuit Court of Appeals as to the binding obligation of the oral contract made with the agent of the Telegraph Company, or the question of negligence of the Company in the transmission and delivery of the message. The right of Hastings and Lange to recover was based upon the theory that the contract was an option terminable by the act of the buyer in failing to make the payment on the contract, which payment, it is found, would not have been made had the message been promptly delivered. An option is a privilege given by the owner of property to another to buy the property at his election. It secures the privilege to buy and is not of itself a purchase. The owner does not sell his property; he gives to another the right to buy at his election.

What then is the nature of this agreement? It contains the positive undertaking of the owner to sell and the purchaser to buy 625,000 shares of stock upon terms which are named. Upon the first payment being made, the certificates are to be deposited with the bank in escrow, to be delivered when the final payment agreed upon is made, and in event of default in payment the bank is authorized to deliver the shares of stock to Pitt and Campbell, and all payments are to be forfeited, and the rights of the parties to cease and determine. We are of opinion that this is far more than a mere option to purchase, terminable at the will of the purchaser upon failure

to make the payments required.  The agreement contains
positive provisions binding the owner to sell and the
purchaser to buy upon the terms of the instrument.  It
is true the stock is to be deposited with the bank in escrow,
and it is authorized to deliver the same to Pitt and Camp-
bell upon default in payment.  The findings do not show
whether Pitt and Campbell took back the stock upon
default of subsequent payments.  There was no under-
standing that Pitt and Campbell should take back the
stock when the payments were not made, and no agree-
ment which put it in the power of the purchasers to relieve
themselves of the obligations of their contract by failing
to keep up the payments.  The right of Pitt and Camp-
bell to receive the stock from the bank and end the con-
tract was stipulated; it was a provision inserted for their
benefit, of which they might avail themselves at their
election.

In our opinion *Stewart* v. *Griffith*, 217 U. S. 323, is con-
trolling upon this point.  In that case there was a sale of
land and the purchaser by the terms of the agreement
paid $500 as part of the purchase price.  It was provided
that in case of non-payment of the balance of the first
half of the purchase price on November 7, 1903, the $500
paid on the contract was to be forfeited and the contract
of sale and conveyance was to be null and void and of no
effect.  The contention was that the defendant was free
to withdraw from the contract if he chose to lose the
$500.  But this court held, after considering the terms of
the contract, that the $500 was part of the purchase
price to be paid; that the land was described as being
sold, and that in view of such stipulations, the purchaser
had bound himself to take the land.  As to the provision
for the forfeiture of the $500, and the stipulation that
the contract should become null and void upon non-
payment of the remainder of the purchase price, this
court said: "The condition plainly is for the benefit of

the vendor and hardly less plainly for his benefit alone, except so far as it may have fixed a time when Stewart might have called for performance if he had chosen to do so, which he did not. This being so, the word void means voidable at the vendor's election and the condition may be insisted upon or waived at this choice. *Insurance Co.* v. *Norton*, 96 U. S. 234; *Oakes* v. *Manufacturers' Insurance Co.*, 135 Massachusetts, 248, 249; *Titus* v. *Glen Falls Ins. Co.*, 81 N. Y. 410, 419."

The condition in the contract in *Stewart* v. *Griffith* that non-payment should render the contract null and void is the equivalent of the stipulation in the present agreement, much relied upon by the respondents, that upon non-payment of the stipulated sums the rights of each of said parties should cease and determine. We think the attempted distinction between *Stewart* v. *Griffith* and the instant case is untenable.

The Circuit Court of Appeals reinforced its conclusion that the contract was an option by stating that it was usual to sell mining property under privileges of purchase, and when investigation showed that the property was not valuable, to terminate such options by forfeiting the sums paid therefor, and declining to make future payments. It is true that undeveloped mining property is often sold under option agreements. (See 3rd Lindley on Mines, § 859.) But there is nothing to show that this contract was dependent upon the development of the mining property. The written agreement contains a positive undertaking to sell upon the one part, and upon the other part to buy, shares of the mining stock. Whether the shares sold constituted all the shares of the company does not appear. Nor is the relative proportion of those sold to the whole amount of the stock anywhere shown. The fact that the contract contains a privilege of ending it at the election of the vendor for non-payment of the sum stipulated, does not convert it into an option ter-

minable by the purchasers at their will.  *Stewart* v. *Griffith, supra.*

As the recovery of the amount paid, with interest, as adjudged in the Circuit Court of Appeals, is founded upon its conclusion that the contract was an option, and the damages the amount paid and forfeited by the failure to stop the payment of the draft, and as we are not able to accept that view of the contract, it follows that the judgment of the Circuit Court of Appeals must be reversed, and the cause remanded to the District Court for further proceedings in conformity to this opinion.

*Reversed.*